IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIMBERLY DEROSSETT                     :

    v.                                 :   Civil Action No. DKC 21-1294

                                  :

JONATHAN C. PATROWICZ, D.O.,
P.A., and SIGNATUREMD, INC.           :

## MEMORANDUM OPINION

Pending and ready for resolution in this Telephone Consumer Protection Act case is the joint motion for summary judgment by Defendants Johnathan Patrowicz and SignatureMD, (ECF No. 32), the cross-motion for summary judgment by Plaintiff Kimberly Derossett, (ECF No. 45), Plaintiff's motion for class certification, (ECF No. 37), Defendant's motion for leave to file audio files, (ECF No. 33), and both parties' motions to file certain exhibits and papers under seal, (ECF Nos. 36, 40, and 42). The issues have been briefed, and the court now rules, no hearing being necessary. Local Rule 105.6. Because Defendants' calls are "health care messages" under the Telephone Consumer Protection Act, and because Plaintiff provided prior express consent to receive those calls, Defendants' motion for summary judgment will be granted. Plaintiff's cross-motion for summary judgment and her motion for

class certification will be denied.   The other motions will be granted.[1]

## I.   Background

Defendant Jonathan Patrowicz is a primary care doctor who treats patients in Salisbury, Maryland.   (ECF No. 32-3, at 2).[2]

---

[1] Plaintiff asked this court to rule on her class certification motion before deciding summary judgment "[t]o avoid violation of the one-way intervention rule[.]"   (ECF No. 45-1, at 1).   One-way intervention occurs where a plaintiff "wait[s] on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, interven[es] to take advantage of the judgment[.]" *Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir.), *cert. denied*, 528 U.S. 985 (1999).   Thus, the one-way intervention rule generally "precludes [class] certification" after a plaintiff has already "acquir[ed] a favorable ruling on the merits" because "[a]llowing class members to decide whether or not to be bound by a judgment depending on whether it is favorable or unfavorable is . . . unfair to the defendant." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1057-58 (7th Cir. 2016) (quotation omitted).   Because the rule is meant to protect defendants, a defendant may voluntarily forgo the rule's protections and "moot" the class certification issue by moving for—and obtaining—summary judgment "before the district judge decide[s] whether to certify the suit as a class action." *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995).   Here, Defendants moved for summary judgment without waiting for the class certification issue to be raised or resolved, (ECF No. 32), and they do not ask the court to decide the class certification motion before granting summary judgment.   As will be discussed, the court will grant Defendants' summary judgment motion, Ms. Derossett's motion for class certification is moot, and the one-way intervention rule does not apply. *See Cowen*, 70 F.3d at 941; *see also Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) ("when a defendant moves for summary judgment *before* the class has been properly certified and notified[,] . . . the district court may grant the defendant's motion for summary judgment" without deciding class certification) (emphasis in original).

[2] Unless otherwise noted, the facts included here are uncontested and construed in the light most favorable to Plaintiff.

He is one of few general practitioners in the area, and—as of last year—he had nearly four-thousand patients. (ECF No. 32-3, at 2). In early 2021, he decided to restructure his practice. (ECF No. 32-3, at 2). He planned to reduce the practice to 300 patients, each of whom would pay an annual membership fee. (ECF No. 32-3, at 2). That meant that the vast majority of Dr. Patrowicz's patients were about to lose their primary care doctor. (ECF No. 32-3, at 2-3).

Seeking to enroll patients in his new practice, Dr. Patrowicz began a several-month-long messaging campaign, through which he emailed, called, and sent letters to his current patients. (ECF No. 32-3, at 3-8). To help in that effort, he hired Cypress Membership Medicine (later acquired by Defendant SignatureMD), a consulting company that helps doctors transition to concierge and subscription-based treatment models. (ECF No. 32-3, at 3); (ECF No. 41-1, at 14). SignatureMD sought to help Dr. Patrowicz persuade enough patients to join his new practice so that he could transition to a membership-based model without suffering severe income loss. (ECF No. 41-1, at 55).

On April 6, 2021, Dr. Patrowicz sent an email and a letter to his patients announcing the upcoming changes. (ECF No. 32-12); (ECF No. 32-13). He explained that he would be "limiting" his practice to "300 patients on a first-come-first-served basis." (ECF No. 32-12). Any patient who sought to "continue" receiving

3

his care, he said, would have to pay a membership fee.  (ECF No. 32-12).  SignatureMD helped to draft that letter and email.  (ECF No. 46-1, at 14).  A SignatureMD transition manager told Dr. Patrowicz that the letter and email were meant to "inform and encourage patients to . . . sign[] up before they lose their spot" and to "encourage sales without sounding too 'salesy.' "  (ECF No. 46-1, at 14).

Dr. Patrowicz also contacted his patients through two phone calls that contained prerecorded voice messages.  The first call—made a few weeks after the announcement letter—discussed "changes" to his patients' care and invited patients to attend a webinar where they could ask questions.  (ECF No. 32-3, at 4-5).  In full, it said:

> Hello, this is Dr. Jonathan Patrowicz calling by voice recording.  I'm calling to make sure you received the letter I sent a couple weeks ago regarding my new personalized healthcare program.
>
> Because many of you have questions regarding the changes, and in an effort to help you make fully informed decisions, I'm hosting a live, informational webinar next Wednesday, April 28th at 6pm via Zoom.  I sincerely hope that you'll be able to join me.  If you'd like to attend the meeting next Wednesday evening, you can register by pressing 1 NOW.
>
> If you cannot attend, I encourage you to reach out to my patient liaison, Kelli Carpenter, at 410-341-1540.  She can answer questions or get you signed up over the phone.  The first few weeks of enrollment have exceeded all my expectations and membership is filling up quickly, so please, don't miss the opportunity to find out more.  Thank you and have a great evening.

(ECF No. 32-3, at 4-5).

The second call—made a few weeks after the first—encouraged any remaining interested patients to sign up because the practice was nearly full.  (ECF No. 32-3, at 5-6).  It stated:

> Hello, this is Dr. Jonathan Patrowicz calling by voice recording.  I wanted to extend my thanks to all of you who participated in the Webinar about our new personalized medical practice this past Wednesday evening.  I'm so pleased at the large number of patients who have elected to stay with our practice as members.
>
> At this point, the practice is about 2/3 full in just over 4 weeks since we made the initial announcement.  If you're still undecided or need additional information, please don't hesitate to reach out to my patient liaison, Kelli Carpenter, at 410-341-1540 or KCarpenter@YourCypress.com.
>
> Again, spots for memberships are filling quickly, so if you have any questions or would like to sign up, please call Kelli Carpenter at 410-341-1540 today.  Your loyalty is greatly appreciated, and I hope to continue our partnership as we start this new journey together.

(ECF No. 32-3, at 5-6).

SignatureMD helped Dr. Patrowicz record both messages, and each message was based on a template SignatureMD provided.  (ECF No. 38-4, at 22).  Dr. Patrowicz likewise sent SignatureMD his patients' contact information, and SignatureMD used that information to send the voice messages to each patient's phone.  (ECF No. 41-1, at 30).  These calls were made only to patients whom Dr. Patrowicz had treated before.  (ECF No. 32-3, at 6).

Plaintiff Kimberly Derossett was one such patient.  (ECF No. 41-3, at 113).  Ms. Derossett first sought care from Dr. Patrowicz's practice in 2005.  (ECF No. 41-3, at 52-54).  For the

next decade, she visited his office "[a]t least annually[,]" (ECF No. 41-3, at 62), and, according to the office's records, she sought the practice's care more than thirty times.  (ECF No. 32-3, at 6).  While receiving that care, Ms. Derossett gave the practice her phone number, (ECF No. 32-3, at 6), and signed a privacy form, (ECF No. 32-24).  That form authorized the practice to "use and disclose" her phone number in several ways.  (ECF No. 32-22).  For instance, she agreed that she could be "contact[ed]" about "health-related . . . services that may be of interest to [her]."  (ECF No. 32-22).  She also authorized Dr. Patrowicz to "use and disclose" her contact information "in order to perform the necessary administrative . . . and business functions of [his] practice."  (ECF No. 32 22).

In 2015 or 2016, Ms. Derossett began visiting a different primary care doctor.  (ECF No. 41-3, at 55).[3]  Around that time,

---

[3] Ms. Derossett seeks to brings this case on behalf of herself and a class, apparently, of Dr. Patrowicz's "patients" who received prerecorded calls on April 22, 2021, and May 5, 2021. (ECF No. 26, at 5-7). The Amended Complaint does not contain any allegations about Ms. Derossett's relationship with Dr. Patrowicz's practice, except to deny that she ever provided the practice "express written consent." (ECF No. 26, at 7). The Amended Complaint also alleges that she did not give SignatureMD her phone number, express consent, or express written consent. (ECF No. 26, at 7).  In her motion papers, she similarly ignores her own personal relationship with the practice. (ECF No. 46);(ECF No. 50). Defendants do, however, acknowledge that Ms. Derossett contends that she left for another provider well before receiving the challenged calls. (ECF No. 32-1, at 8).  Ms. Derossett does not make any arguments that turn on her status as a possible "former patient" as opposed to a "current patient."  This is likely because she seeks to represent

she called Dr. Patrowicz's office and asked for her medical records to be transferred.   (ECF No. 41-3, at 55).   The employee who answered the phone told Ms. Derossett that the practice "no longer considered [her] a patient[.]"   (ECF No. 41-3, at 55).   That employee also said that Ms. Derossett would need to pay a $45 transfer fee, and that she would have to come into the office to fill out transfer paperwork.  (ECF No. 41-3, at 56).  Ms. Derossett did not do either.   (ECF No. 41-3, at 56).   As a result, when Dr. Patrowicz began calling his patients in 2021, he had no record of Ms. Derossett leaving his practice or finding a new doctor.  (ECF No. 32-3, at 7).

Ms. Derossett concedes that if she "were a patient" of Dr. Patrowicz, she would "want" to receive the prerecorded calls he sent.   (ECF No. 41-3, at 108).   But because she did not consider herself an active patient, she found the calls to be a "nuisance." (ECF No. 41-3, at 111).   Nevertheless, she did not contact Dr. Patrowicz to ask him to stop contacting her.   (ECF No. 41-3, at 112).

Instead, she sued him: On May 25, 2021—about one month after Dr. Patrowicz made his first prerecorded call—Ms. Derossett filed this case against his holding company.  (ECF No. 1).  She alleged

---

a class of all those who received calls.   (ECF No. 26, at 7).   As explained below, it is Defendants' burden to prove that a relevant exception to TCPA liability applies, so Ms. Derossett's purported departure from Dr. Patrowicz's practice will be discussed.

that, by making prerecorded calls to her cellphone, Dr. Patrowicz violated the Telephone Consumer Protection Act.  She later amended her complaint to alter the Defendants.  (ECF No. 26).  After conducting discovery, Defendants moved for summary judgment.  (ECF No. 32).  Ms. Derossett cross-moved for summary judgment, (ECF No. 45), and moved for class certification, (ECF No. 37).  Both parties filed replies.  (ECF Nos. 49 and 50).

## II.  Standard of Review

A court will grant a motion for summary judgment when there is no genuine dispute of a material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F.Supp.2d 373, 375 (D. Md. 2001) (citation omitted).  Indeed, this court has an affirmative obligation to prevent

factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal citation and quotations omitted). In doing so, it must "take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal citation and quotations omitted).

## III. Analysis

### A.   Defendants' motion for summary judgment

Congress enacted the Telephone Consumer Protection Act (TCPA) to "prevent abusive telephone marketing practices" and to reduce "intrusive[] nuisance calls[.]" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 648-49 (4th Cir. 2019).  To that end, the statute "impose[s] a number of restrictions" on unwanted calls.  *Id.* at 649.  As relevant here, the TCPA bars a caller from making a "prerecorded" phone call to a cellphone without the called party's consent.  47 U.S.C. § 227(b)(1)(A)(iii).  Consent is not an element of a TCPA claim, but rather "an affirmative defense for which the defendant bears the burden of proof." *Van Patten v. Vertical*

*Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).  The TCPA also empowers the Federal Communications Commission (FCC) to "prescribe regulations to implement" the statute, and to create exemptions to statutory liability "by rule or order[.]"  47 U.S.C. § 227(b)(2)(B).

Under that authority, the FCC has created a "two-tier system of consent" for TCPA liability, with different kinds of calls requiring different kinds of consent.  *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F.Supp.3d 466, 477 (S.D.N.Y. 2018).  First, prerecorded calls that do not include "telemarketing" are lawful as long as the called party has provided "prior express consent." 47 C.F.R. § 64.1200(a)(1)-(2).  Second, prerecorded calls that *do* include "telemarketing" require "prior express *written* consent[.]" § 64.1200(a)(2) (emphasis added).  Prior express consent is a "lower threshold[,]" *see Rotberg*, 345 F.Supp.3d at 477—a called party generally provides such consent simply by giving her phone number to a business in connection with a transaction.  *See, e.g.*, *Van Patten*, 847 F.3d at 1044.  Prior express *written* consent, by contrast, is harder to obtain—to provide such consent, a party must sign a written agreement that "clearly authorizes" the caller to send "telemarketing messages using a[] . . . prerecorded voice[.]"  § 64.1200(f)(9).

The FCC has also created several exceptions to the rule that a telemarketing call requires prior express written consent.  *See*

§ 64.1200(a)(2).  For instance, under the "health care message" exception, a telemarketing call that "delivers a health care message" requires only prior express consent, not prior express *written* consent.  § 64.1200(a)(2) (internal quotations removed).  In other words, while most telemarketing calls are unlawful without satisfying the "heightened" prior-express-written-consent threshold, telemarketing calls that also deliver a "health care message" are lawful as long as the caller meets the "lower" prior-express-consent threshold.  *See Rotberg*, 345 F.Supp.3d at 477.

Here, Ms. Derossett argues that, because Dr. Patrowicz sought to sell memberships to his new practice, his calls involved "telemarketing" and thus they are unlawful without prior express written consent.  (ECF No. 45-1, at 29-31).  She likewise argues that she never provided such consent because—even though she gave Dr. Patrowicz her phone number and authorized him to call her for certain reasons—she never expressly allowed him to send prerecorded messages.  (ECF No. 45-1, at 38).[4]

Defendants seem to concede that Ms. Derossett never provided prior express *written* consent, but they argue that this heightened

---

[4] Defendants incorrectly assert that the FCC recently changed its definition of "prior express written consent."  (ECF No. 49-1, at 18).  The 2020 FCC order that Defendants cite to support that argument, *see In the Matter of Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 35 FCC Rcd. 6526 (2020), does not do so.

consent was not required.  (ECF No. 32-1, at 28).[5]  Rather, they assert that they merely had to meet the lower prior-express-consent threshold because, even if their calls involved telemarketing, they "deliver[ed] a health care message" and thus fit the health care message exception, *see* § 64.1200(a)(2).  (ECF No. 32-1, at 28).  They also argue that Ms. Derossett provided this less-stringent form of consent because she gave Dr. Patrowicz her phone number and signed his privacy form.  (ECF No. 32-1, at 28-31).[6]

_____

[5] At the end of their reply brief, Defendants seem to argue—for the first time—that Ms. Derossett did provide "express written consent."  (ECF No. 49-1, at 17-19).  But even there, Defendants do not actually assert that Ms. Derossett's consent meets the regulatory requirements for "prior express written consent"—i.e., they do not argue that Ms. Derossett "clearly authorize[d]" Dr. Patrowicz to send "prerecorded" "telemarketing messages[.]"  § 64.1200(f)(9).  Rather, they merely argue that, because Ms. Derosett *signed* the doctor's privacy forms, her consent was technically "written" (as opposed to, for example, verbal).  (ECF No. 49-1, at 18).  That assertion is irrelevant; under TCPA regulations, a called party does not provide "prior express written consent" simply by signing a consent form—rather, that consent form must also expressly authorize the caller to send "prerecorded" "telemarketing" calls.  § 64.1200(f)(9).  And all agree that the privacy form Ms. Derossett signed contained no such language.  *See* (ECF No. 32-22).

[6] Defendants alternatively argue that their calls were made for the "emergency" purpose of notifying patients that they were about to lose their doctor, *see* (ECF No. 32-1, at 32), and thus require no consent because the TCPA does not require any consent for a prerecorded call "made for emergency purposes[.]"  *See* § 64.1200(a)(1); *see also* § 64.1200(f)(4) (defining "emergency purposes").  The court need not reach that argument because it holds that the calls were health care messages delivered with prior express consent, and thus did not violate the TCPA.  *See* § 64.1200(a)(2).

Defendants are right.  First, the calls here fit the health care message exception because they delivered a health care message about changes to patients' primary care services.  Second, Ms. Derossett provided the prior express consent that such a health care message requires.[7]

### i.  The health care message exception applies because the calls delivered messages about changes to patients' primary care services.

Under the health care message exception, *see* § 64.1200(a)(2), a "covered entity" or its "business associate" may lawfully place a telemarketing call that "delivers a . . . message" about "health care[,]" as long as the called party provides prior express consent. The exception likewise states that the terms "covered

---

[7] Defendants also alternatively argue that they need not obtain any consent because their calls comply with HIPAA.  (ECF No. 32-1, at 27).  To the contrary, HIPAA does not "supersede" the TCPA.  *ACA Int'l v. FCC*, 885 F.3d 687, 712 (D.C. Cir. 2018). Rather, HIPAA and the TCPA " 'provide separate protections[,]' " and "[t]here is no obstacle to complying with [them] both[.]"  *Id.* (quoting *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1125 (11th Cir. 2014)).  As Defendants point out, no consent is required for a HIPAA-compliant call containing a "health care message" that is sent to a "residential line" (i.e., a home phone).  (ECF No. 32-1, at 27); *see* 47 C.F.R. § 64.1200(a)(v).  But the calls here were sent to Ms. Derossett's *cellphone*, and Defendants are wrong to say that the FCC "extended" its blanket residential-healthcare-call consent exemption "to cellphone calls."  (ECF No. 32-1, at 27).  The FCC crafted a "narrower exemption" for health care messages sent to "*wireless* numbers."  *ACA Int'l*, 885 F.3d at 713 (emphasis in original).  A health care message sent to a cellphone still requires prior express consent—as the regulations plainly state, *see* § 64.1200(a)(2), and several courts have held, *see, e.g.*, *Latner v. Mount Sinai Health System, Inc.*, 879 F.3d 52 (2d Cir. 2018); *Rotberg*, 345 F.Supp.3d at 477.

entity," "business associate," and "health care" are defined by the HIPAA Privacy Rule, *see* 45 C.F.R. § 160.103.  Here, all agree that Dr. Patrowicz is a "covered entity."  *See* § 160.103 ("covered entity" includes "a health care provider").  And SignatureMD—a consultant the doctor hired to help execute his patient calls—is no doubt Dr. Patrowicz's "business associate."  *See id.* ("business associate" includes a party that provides "consulting" services to a covered entity).  Thus, the only question is whether the calls Ms. Derossett received "deliver[ed] a 'health care' message[.]"  § 64.1200(a)(2).  If they did, the calls required mere prior express consent.  If they did *not*, then the calls required prior express *written* consent—a heightened threshold that Defendants effectively concede they did not meet.  *See* (ECF No. 49-1, at 17-19).

The exception applies here because the calls delivered a "health care message."  HIPAA defines "health care" to include "care, services, or supplies related to the health of an individual."  § 160.103.  Thus, a "health care message" is exactly what it sounds like: A message related to an individual's care or services.  *Id.*  In other words, a call delivers a "health care message" if it "concerns a product or service that is inarguably health-related[,]" *see Zani v. Rite Aid Headquarters Corp.*, 246 F.Supp.3d 835, 851 (S.D.N.Y. 2017), *aff'd*, *Zani v. Rite Aid Headquarters Corp.*, 725 Fed.App'x. 41 (2ᵈ Cir. 2018), or if it involves "the health needs of the intended recipient[,]" *see Sandoe*

*v. Bos. Sci. Corp.*, No. 18-11826, 2020 WL 94064, at *5 (D.Mass. Jan. 8, 2020).

The calls here delivered "health care messages" because they relate to patients' care and services—indeed, each call discussed impending changes to patients' primary care.  In the first call, Dr. Patrowicz referenced a letter he had sent in which he announced that his practice would be downsizing, *see* (ECF No. 32-13), and he invited his patients to ask questions about the impending "changes" to their "healthcare program."  (ECF No. 32-1, at 12).  In the second call, he explained that his downsized "medical practice" was nearly full and encouraged any other interested patients to sign up while spots remained.  (ECF No. 32-1, at 13).  Dr. Patrowicz called his patients to warn them that they would soon lose their doctor if they did not sign up for his new practice.  It is hard to imagine a message more related to "health care" than one that notifies a patient that she may soon lose her doctor.

Indeed, other federal courts have applied the health care message exception to communications that had a far less intimate link to a patient's care.  For example, in *Latner v. Mount Sinai Health System, Inc.*, a hospital texted patients to advertise its flu shot services.  879 F.3d 52, 54 (2d Cir. 2018).  One such patient sued under the TCPA, arguing that the text was telemarketing.  *Id.*  The United States Court of Appeals for the Second Circuit held that the health care message exception applied

15

because the text delivered a "message about a health-related benefit"—namely, a flu shot. *Id.* at 55 (cleaned up). So too here: If a flu shot reminder delivers a health care message, then a call notifying a patient she may soon lose her doctor does too.[8]

In sending the prerecorded calls, Defendants no doubt also sought to make sales; Dr. Patrowicz wanted patients to buy memberships for his new practice. (ECF No. 41-1, at 55). But nothing in the TCPA suggests that a health care message cannot also encourage sales. Indeed, the health care message exception is meant for calls that *both* "constitute[] telemarketing" *and* "deliver[] a healthcare message." § 64.1200(a)(2). Thus, when a call "delivers a health care message[,]" it is "immaterial" whether it was "sent for a marketing purpose"—either way, it requires mere prior express consent. *Zani*, 246 F.Supp.3d at 844, 848, 857. Here, Dr. Patrowicz sent messages that both marketed his new practice and notified his patients about changes to their care. If either call "constitute[d] telemarketing," then it was a telemarketing call that "deliver[ed] a health care message[,]"

---

8    *See also Zani*, 725 Fed.App'x. at 42 (applying health care message exception to a pharmacy's prerecorded calls advertising flu shots); *Sandoe*, 2020 WL 94064, at *5 (applying health care message exception to a medical device manufacturer's prerecorded calls inviting pain patients to attend a seminar at which the manufacturer's products were discussed).

which is precisely the kind of call to which the health care message exception applies.  § 64.1200(a)(2) (quotation omitted).[9]

Ms. Derossett wrongly relies on the Second Circuit's reasoning that "[t]here may well be [calls] that, though purportedly delivering a health care message, are so laden with marketing material as to raise a factual issue as to whether they fall outside" the health care message exception, *see Zani*, 725 Fed.App'x. at 44.  (ECF No. 45-1, at 24).  To start, that reasoning contradicts the regulation itself.  The regulation does not say that a call that delivers a health care message can still require prior express written consent simply because it contains *too much* advertising.  Rather, the regulation says that a call that both "delivers a 'health care' message" and "constitutes telemarketing" requires only prior express consent—no matter *how much* "telemarketing" the call includes.  § 64.1200(a)(2).

And even if the Second Circuit is right that a call delivering a health care message can be so full of advertising that it requires prior express *written* consent, the calls here come nowhere near crossing that line.  These calls were not "laden with

---

[9] The health care message exception applies here regardless of whether Ms. Derossett was a current or former patient of Dr. Patrowicz.  Either way, she received a call from a doctor that had treated her many times, and the call informed her about reduced availability for that doctor's care.  Ms. Derossett may not have wanted to receive the message, but there is no doubt that it pertained to "health care[.]"  § 64.1200(a)(2).

marketing"—they do not mention prices, purchasing, special deals, or anything of the sort.   Indeed, in *Zani* itself, the Second Circuit held that a more explicitly commercial call—one that mentioned payment through "insurance plans"—raised "no . . . concerns" about excessive "marketing material" and thus "c[ame] within the [health care message exception] . . . as a matter of law."   725 Fed.App'x. at 42, 44.

In an attempt to argue that the health care message exception does not apply, Ms. Derossett seems to assert that the calls do not meet the requirements for a *different* TCPA rule related to healthcare: § 64.1200(a)(9)(iv), the so-called "exigent healthcare treatment exception." (ECF No. 45-1, at 23).[10]   The exigent healthcare treatment exception exempts certain urgent treatment calls from *any* consent requirement at all—that is, "it exempt[s] such calls from [both] the prior express consent requirement . . . [and] the prior express written consent requirement[.]"   *Zani*, 246 F.Supp.3d at 846.   Because the exigent healthcare treatment

---

[10]   The regulation that contains the exigent healthcare treatment exception—§ 64.1200(a)(9)(iv)—does not use the word "exigent," but the FCC in a 2015 order described that exception as pertaining to calls "for which there is exigency and have a healthcare treatment purpose," *see In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2015 FCC Order"), 30 FCC Rcd. 7961, 8031 ¶ 146 (2015).   Several courts have thus called it the "exigent healthcare treatment exception." *See, e.g.*, *Hudson v. Ralph Lauren Corporation*, 385 F.Supp.3d 639, 647 (N.D.Ill. 2019); *Bailey v. CVS Pharmacy, Inc.*, no. 17-cv-11482, 2018 WL 3866701, at *4 (D.N.J. Aug. 14, 2018).

exception goes "further" in its consent exemptions than the health care message exception, *see id.*, it naturally is harder to satisfy. For instance, while a call that includes "telemarketing" may still qualify for the health care message exception, *see* § 64.1200(a)(2), an exigent healthcare call *cannot* "include" "telemarketing[,]" and it must pertain to a topic from an enumerated list, *see* § 64.1200(a)(9)(iv). And Ms. Derossett may very well be right that the calls here do not meet those heightened requirements. But that is irrelevant because Defendants never invoked the exigent healthcare treatment exception in the first place.[11]

Finally, Ms. Derossett points to a 2015 FCC order in which the agency said that a healthcare call cannot "include telemarketing[.]" 2015 FCC Order, 30 FCC Rcd. at 8031 ¶ 146. But that language is irrelevant for the same reason: It is about the exigent healthcare treatment exception, not the health care message exception. *Id.* Indeed, in the very same paragraph that

---

[11] Besides exempting exigent treatment calls from any consent requirement, *see* § 64.1200(a)(9)(iv), the TCPA regulations separately state that calls "made for emergency purposes" do not require consent, *see* § 64.1200(a)(1). The exigent healthcare treatment exception (*see* § 64.1200(a)(9)(iv)), the emergency purposes exception (*see* § 64.1200(a)(1)), and the health care message exception (*see* § 64.1200(a)(2)), are all different rules with different requirements. Here, Defendants invoke the health care message exception and the emergency purposes exception, *see* (ECF No. 32-1, at 28, 32), but they do not invoke the exigent healthcare treatment exception. In arguing that Defendants' calls do not meet the requirements for that exception, Plaintiff seems to have misunderstood the admittedly confusing regulations to the TCPA.

Ms. Derossett cites, the FCC explains that no consent is required when "there is exigency[,]" and that an exigent healthcare call cannot "include telemarketing, solicitation, or advertising content." *Id.* In other words, Ms. Derossett's chosen language merely restates the requirements listed in the exigent healthcare treatment exception, *see* § 64.1200(a)(9)(iv), and it has nothing to do with the health care message exception on which Defendants rely. All told, Dr. Patrowicz's calls "deliver[ed] a health care message[,]" and thus they were lawful as long as Ms. Derossett provided prior express consent. § 64.1200(a)(2).

### ii. Ms. Derossett provided prior express consent to receive these calls.

Ms. Derossett provided prior express consent for the calls she received. Neither the TCPA nor its regulations define "prior express consent." Rather, the FCC has defined the term through a series of orders. *See* 47 U.S.C. § 227(b)(2) (the FCC may implement exemptions to TCPA liability "by rule or order"). Most recently, the FCC has said that when a person "knowingly release[s] [her] telephone number[] for a particular purpose[,]" she gives prior express consent "to be called at th[at] number . . . for that purpose[.]" *In the Matter of Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991* ("2020 FCC Order"), 35 FCC Rcd. 6526, 6530 ¶ 13 (2020) (internal quotations omitted). Federal courts have likewise held that, by giving a phone number as part of a transaction, a person gives prior express consent to receive

20

"transaction-related communications[,]" *see Van Patten,* 847 F.3d at 1044, and calls that "bear[] some relation to the reason for which the number was originally provided." *Jackson v. Safeway, Inc.*, No. 15-cv-04419-JSC, 2016 WL 5907917, at *10 (N.D.Cal. Oct. 11, 2016).[12]

By any of these measures, Ms. Derossett provided prior express consent to receive the calls here.  When she gave her phone number to Dr. Patrowicz's practice, she signed a privacy form allowing the practice to "use and disclose" her contact information for various reasons—several of which cover the calls she later received.  (ECF No. 32-22).  For instance, she agreed that she could be "contact[ed]" about "health-related . . . services that may be of interest to [her]."  (ECF No. 32-22).  That is what happened here: Dr. Patrowicz "contact[ed]" Ms. Derossett about his new practice—a "health-related . . . service[]" that he believed she "may" have been "interest[ed]" in because she had sought his treatment for many years before. (ECF No. 32-3, at 6).

She also authorized Dr. Patrowicz to "use and disclose" her contact information "in order to perform the necessary administrative . . . and business functions of [his] practice."

---

[12] *See also In the Matter of Rules & Regs. Implementing the Tel. Cons. Prot. Act of 1991*, 7 FCC Rcd. 8752, 8769 ¶ 31 n.57 (1992) (a person who gives her phone number to a business has given prior express consent to be called "at th[at] number" "for . . . normal business communications") (quoting H.R. Rep. No. 102-317 at 13).

(ECF No. 32-22).   That again is exactly what happened here: Informing a person that she may soon lose access to a doctor that has previously treated her—and explaining how she can see him in the future if she would like—is no doubt a "necessary" "administrative . . . and business" task for a primary care practice.   (ECF No. 32-22).   Dr. Patrowicz thus "use[d]" Ms. Derossett's phone number "in order to perform" that necessary function.   (ECF No. 32-22).   In the end, Ms. Derossett provided her phone number "for a particular purpose" and she was called "for that purpose[.]"   *See* 2020 FCC Order at 6530, ¶ 13 (internal quotations omitted).   That means she gave prior express consent.[13]

In a similar case, the United States Court of Appeals for the Second Circuit held that a plaintiff provided prior express consent because he authorized a healthcare provider to contact him about health-related services.   *See Zani*, 725 Fed.App'x. at 41.   In *Zani*, a plaintiff gave his phone number to his pharmacy when filling a prescription.   *Id.* at 42.   He also signed a privacy form that authorized the pharmacy to "contact [him] . . . about . . . health

_____

[13] Ms. Derossett argues that she did not provide consent because Dr. Patrowicz's "operative Privacy Policy" states that his practice will not share his patients' information for "marketing purposes."   (ECF No. 46-1, at 18).   That argument muddles the record.   That language exists in the most recent version of Dr. Patrowicz's privacy form—one that was updated in 2019.   (ECF No. 41-1, at 64-66, 74).   But that is not the privacy form Ms. Derossett signed; the version she signed was last updated in 2004 and contained no "marketing purposes" protections.   (ECF No. 32-22); (ECF No. 32-24).

related benefits and services that may be of interest." *Id.* at 42.   The hospital later sent him a prerecorded call encouraging him to get a flu shot, and he sued, arguing that the call was telemarketing under the TCPA.   *Id.* at 42.   The Second Circuit held that Plaintiff had provided prior express consent because a flu shot is a "health-related benefit that might have been of interest to him."   *Id.* at 43 (quotation omitted).   So too here: If a person would be interested in a flu shot, she would no doubt be interested to learn how she could avoid losing her doctor.

What is more, Ms. Derossett does not even try to argue that she did not provide prior express consent to Dr. Patrowicz.   (ECF No. 45-1, at 28); (ECF No. 50-1, at 9).   Instead, she asks this court to "deny SignatureMD's request for summary judgment" because she "never provid[ed] her phone number . . . to SignatureMD" and thus—she argues—SignatureMD lacked prior express consent to help Dr. Patrowicz place the calls.   (ECF No. 45-1, at 28, 29).

That argument fails because, to obtain prior express consent, a caller need not "receive[] the number directly" from the called party.   *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11ᵗʰ Cir. 2014).   Rather, when a person authorizes a business to "disclose" her phone number "in connection with" a particular purpose, she provides prior express consent for third parties that receive her number from that business to call her for that purpose. *See id.*   For example, in *Mais*, a patient visited a hospital

emergency room, gave the hospital his phone number, and signed a privacy form authorizing the hospital to "use and disclose" his number to "collect payment[.]"  *Id.*  The hospital later gave his number to a debt collector, who called the patient to collect payment for the emergency room bill.  *Id.* at 1124.  The United States Court of Appeals for the Eleventh Circuit held that—even though the patient never "directly" gave his number to the debt collector—he nonetheless provided prior express consent "via an intermediary" by allowing the hospital to disclose his number "in connection with" his payment.  *Id.* at 1123 (quotation omitted). Thus, the debt collector had prior express consent to call the patient about his unpaid emergency room bill.  *Id.* at 1124.

This case is effectively the same: Ms. Derossett authorized Dr. Patrowicz to "use and disclose" her number both to "contact[]" her about "health-related . . . services[,]" and as "necessary . . . to perform" his practice's business functions.  (ECF No. 32-22).  Dr. Patrowicz thus disclosed her number to SignatureMD, and SignatureMD helped the doctor place calls "in connection with" the uses Ms. Derossett authorized.  *Mais*, 768 F.3d at 1123.  Thus, SignatureMD is no more liable under the TCPA than Dr. Patrowicz is.[14]

---

[14] *See also Fober v. Mgmt. & Tech. Consultants, LLC*, No. SACV1501673, 2016 WL 7626431, at *3 (C.D. Cal. 2016) ("courts . . . commonly grant summary judgment to defendants in TCPA cases when a plaintiff provides his or her phone number in conjunction with

What is more, Ms. Derossett seems to concede that she provided prior express consent for a third party to call her for reasons that "had a close relationship to the original purpose" for which she provided her number to Dr. Patrowicz.  (ECF No. 50-1, at 9).  But she argues that SignatureMD's sole aim in helping Dr. Patrowicz place these calls was to "advertise its concierge services[,]" and so SignatureMD's motives were not "close[ly] connect[ed]" to "the purpose for which [she] originally provided her number[.]"  (ECF No. 50-1, at 9).  That argument misunderstands the scope of Ms. Derossett's consent.   She   consented   to   have   her   number "disclose[d]" so that she could be "contact[ed]" about "health-related" "services" that she might be interested in.  (ECF No. 32-22).  She may very well be right that SignatureMD's sole aim was to "advertise its concierge services."  (ECF No. 50-1, at 10).  But that means only that SignatureMD sought to contact Ms. Derossett about a health-related service she might be interested in, which is precisely the kind of contact for which Ms. Derossett authorized her number to be disclosed.

---

a transaction and is then called regarding some aspect of that transaction, even when the phone calls are ultimately made by a third party") (collecting cases); *In re GroupMe, Inc. / Skype Commc'ns S.A.R.L. Petition*, 29 FCC Rcd. 3442, 3446 ¶ 11 (2014) ("consent to be called at a number in conjunction with a transaction extends to a wide range of calls regarding that transaction, even in at least some cases where the calls were made by a third party") (internal quotation omitted).

Ms. Derossett is also wrong to rely on *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959 (7th Cir. 2020). There, the United States Court of Appeals for the Seventh Circuit held that one company could not "transfer" a person's consent "to a completely different company." *Id.* at 967. But that case involved "fax advertisements[,]" *id.*, which are subject to different TCPA consent rules than phone calls. Under the TCPA, a party cannot send "an unsolicited [fax] advertisement" unless the "recipient" "voluntar[ily] communicat[ed]" its fax number to the "sender[.]" 47 U.S.C. § 227(b)(1)(C). In other words, while a party making a phone call can obtain prior express consent without "receiv[ing] the number directly" from the called party, *Mais*, 768 F.3d at 1123, the FCC has said that a party sending unsolicited fax ads "must have obtained the facsimile number *directly* from the recipient[.]" *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, Junk Fax Prevention Act of 2005*, 21 FCC Rcd. 3787, 3794 ¶ 13 (2006) (emphasis added). Applying "those requirements," the Seventh Circuit held that a company could not lawfully fax an advertisement to a recipient who had not directly invited the fax. *Physicians Healthsource*, 950 F.3d at 967-68.

Nor did Ms. Derossett revoke her consent by asking Dr. Patrowicz's practice to transfer her medical records to another doctor. (ECF No. 41-3, at 55). A person may revoke consent under

the TCPA "in any reasonable manner that clearly expresses his or her desire not to receive further calls[.]"  2015 FCC Order, 30 FCC Rcd. at 7999 ¶ 70.  Thus, to revoke consent, a plaintiff must "plainly" tell the defendant to "cease" further "contact[.]"  *See Van Patten*, 847 F.3d at 1048.[15]  For example, in *Van Patten*, a plaintiff provided his phone number to a gym when he signed up for a gym membership.  *Id.* at 1040.  Three days later, he called the gym and cancelled the membership; and, three years after that, the gym began to send him texts inviting him to "[c]ome back[.]"  *Id.* at 1040-41.  The United States Court of Appeals for the Ninth Circuit held that Plaintiff's membership cancellation call was insufficient to revoke his consent.  *Id.* at 1048.  Indeed, because Plaintiff did not explicitly tell the gym "not to contact him[,]" he "did not revoke his consent to be contacted[.]"  *Id.*

Here, Ms. Derossett did not revoke her consent because she never told Dr. Patrowicz to stop contacting her.  Instead, she merely called the practice and asked for her medical records to be transferred to another doctor.  (ECF No. 41-3, at 55).  That

---

[15] *See also Barnett v. Bank of America, N.A.*, 3:20-cv-272-RJC-DSC, 2021 WL 2187950, at *5 (W.D.N.C. May 28, 2021) (finding that "[federal] cases make clear that a [TCPA] Plaintiff cannot use ambiguous statements to revoke consent" and holding that a plaintiff did not revoke consent because he did not "directly ask Defendant to stop contacting him") (collecting cases); *cf. Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014) (denying a TCPA defendant's summary judgment motion because a genuine dispute of material fact existed as to whether plaintiff told defendant to "stop calling").

request might mean that she is no longer Dr. Patrowicz's patient, but because she did not "clearly express" a "desire not to receive . . . calls[,]" *see* 2015 FCC Order, 30 FCC Rcd. at 7999 ¶ 70, she did not revoke her consent to be "contact[ed]" about "health-related" "services" that she might be interested in.  (ECF No. 32-22).

## B.  The parties' motions to file under seal

The parties have made three motions to file exhibits and papers under seal.  (ECF Nos. 36, 40, and 42).

First, Defendants move to file under seal five exhibits attached to their motion for summary judgment.  Three of these exhibits are depositions: (1) Dr. Patrowicz's deposition (ECF No. 41-1), (2) the deposition of SignatureMD employee Julie Robinson (ECF No. 41-2), (3) Ms. Derossett's deposition (ECF No. 41-3). While parts of each of these depositions contain Ms. Derossett's private health information and Dr. Patrowicz's proprietary business information, much of the information in the depositions need not be sealed.  However, the portions of these depositions that are relevant to the disposition of this case are cited in this opinion, so there is no need for the parties to file redacted versions.  Thus, Defendants' motion to file these depositions under seal will be granted.  The remaining two exhibits are duplicates of Ms. Derossett's patient registration form.  (ECF Nos. 41-4 and 41-5).  That document contains Ms. Derossett's private health

information, and it should remain confidential.  Defendants'
motion to file these exhibits under seal will be granted.

Second, Ms. Derossett moves to file under seal her unredacted
motion papers: (1) Plaintiff's Memorandum of Law in Opposition to
Defendants' Joint Motion for Summary Judgment and in Support of
Plaintiff's Cross-Motion for Summary Judgment (ECF No. 46-1), and
(2) Plaintiff's Cross-Motion for Summary Judgment (ECF No. 46).
The redacted portions refer to the depositions that the parties
wish to seal in their entirety, but the quoted sections don't seem
to contain sensitive matters (and some portions are quoted in this
Memorandum Opinion that will not be sealed).  Thus, there is no
need to keep the unredacted motion papers under seal and this
motion will be denied.

Third, Ms. Derossett moves to file under seal four depositions
attached to her motion for class certification.  Three of these
are identical to exhibits that Defendants attached to their motion
for summary judgment: (1) Dr. Patrowicz's deposition (ECF No. 38-
2), (2) the deposition of SignatureMD employee Julie Robinson (ECF
No. 38-3), and (3) Ms. Derossett's deposition (ECF No. 38-5).
Plaintiff's motion to file these exhibits under seal will be
granted for the same reason that Defendants' motion to seal the
same exhibits will be granted.  Plaintiff also moves to file under
seal one deposition that was not attached to Defendants' motion
for summary judgment: The deposition of SignatureMD employee Jodi

Rios-Towns (ECF No. 38-4).  Like the other depositions filed under seal, the parts of Ms. Towns' deposition that are relevant to the disposition of this case are cited in this opinion and a redacted version need not be filed.  Thus, Plaintiff's motion to file this deposition under seal will be granted.

Finally, Defendants move to file audio files containing the audio of Dr. Patrowicz's calls.  (ECF No. 33).  That unopposed motion will be granted.

## IV. Conclusion

Because Defendants' calls are "health care messages" under the Telephone Consumer Protection Act, and because Plaintiff provided prior express consent to receive those calls, Defendants' motion for summary judgment will be granted and Plaintiff's cross-motion for summary judgment will be denied.  Plaintiff's motion for class certification will likewise be denied because it is now moot, and the motions to seal exhibits and the motion to file audio files will be granted, but the motion to seal unredacted copies of motion papers will be denied.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge
